Argued and submitted September 10, 2007, decision of Court of Appeals affirmed; judgment of circuit court affirmed in part and reversed in part, and case remanded to circuit court for further proceedings July 3, 2008

AMERICAN FEDERATION OF
TEACHERS-OREGON, AFT, AFL-CIO,
an Oregon unincorporated association,
*Respondent on Review,*

*and*

STATE OF OREGON,
*Respondent on Review,*

*v.*

OREGON TAXPAYERS UNITED PAC,
an Oregon political committee;
Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Petitioners on Review,*

*and*

John DOES 1 through 10,
*Defendants.*

(CC 0108-08942; CA A122158 (Control))

OREGON EDUCATION ASSOCIATION,
an Oregon nonprofit corporation,
*Respondent on Review,*

*and*

STATE OF OREGON,
*Respondent on Review,*

*v.*

OREGON TAXPAYERS UNITED PAC,
an Oregon political committee;
Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Petitioners on Review,*

*and*

John DOES 2 through 10,
*Defendants.*

(0012-12632; CA A122168; SC S054403)

189 P3d 9

Gregory W. Byrne, Byrne & Associates, Portland, argued the cause and filed the briefs for petitioners on review Oregon Taxpayers United PAC and Oregon Taxpayers United Educational Foundation.

Gregory A. Hartman, Bennett, Hartman, Morris & Kaplan LLP, Portland, argued the cause and filed the brief for respondent on review Oregon Education Association. With him on the briefs were Michael J. Morris, Portland, and Aruna A. Masih, Portland.

Gene Mechanic, Portland, argued the cause and filed the brief for respondent on review American Federation of Teachers-Oregon, AFT, AFL-CIO.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review State of Oregon. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

BALMER, J.

**BALMER, J.**

This case requires us to interpret and apply the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO), ORS 166.715 to 166.735. A jury found that defendants—a political action committee and a nonprofit corporation controlled by the same individuals—engaged with others in a pattern of racketeering activity, as defined in ORICO, by forging signatures to qualify two ballot measures for the 2000 general election and by filing false statements with the state from 1998 through 2000 concerning their expenditures and contributions. The jury also found that defendants' illegal conduct injured plaintiffs—two labor organizations that spent substantial amounts of money opposing the ballot measures. The jury determined that plaintiffs had suffered damages of approximately $840,000, which the trial court trebled pursuant to ORICO. The trial court entered a money judgment in favor of plaintiffs in the amount of approximately $2.5 million and issued an injunction barring defendants from engaging in certain activities. The Court of Appeals reversed one part of the judgment, but otherwise affirmed. *American Fed. Teachers v. Oregon Taxpayers United*, 208 Or App 350, 145 P3d 1111, *adh'd to on recons*, 209 Or App 518, 149 P3d 159 (2006).

On review, defendants argue that, even if their acts constituted ORICO violations, those acts were not the cause of plaintiffs' injuries and, therefore, that plaintiffs were not "injured by reason of" defendants' acts within the meaning of ORS 166.725(7)(a). For the reasons set forth below, we conclude that the evidence was sufficient to permit a jury to find that plaintiffs were "injured by reason of" defendants' conduct. We therefore affirm the decision of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

The Court of Appeals described the facts in detail, and we restate them only to the extent necessary to discuss the legal questions that we address. Plaintiffs, Oregon Education Association (OEA) and American Federation of Teachers AFL-CIO (AFT), are labor organizations that represent educators and other public school employees.

Plaintiffs brought separate ORICO actions, which were later consolidated, against defendants Oregon Taxpayers United Political Action Committee (OTU-PAC) and Oregon Taxpayers United Education Foundation (OTU-EF). Defendant OTU-PAC is a political committee within the meaning of ORS 260.005(16)(a) and was organized under ORS 260.042 by Bill Sizemore and Rebecca Miller, who were directors of the committee at the times relevant to these actions. OTU-EF was an Oregon nonprofit corporation that had been granted approval to operate as a tax-exempt charitable or educational organization under Section 501(c)(3) of the Internal Revenue Code; Sizemore served as executive director of OTU-EF.[1]

Plaintiffs brought these actions under ORICO, alleging that defendants participated in an "enterprise"[2] that consisted of defendants, Miller, Sizemore, three Oregon corporations (I&R Petition Services, Klein Campaigns, and NFP, Inc.), and two other political committees. As described in greater detail below, a jury found that the enterprise engaged in a "pattern of racketeering activity" and that participants in the enterprise violated several criminal statutes in their efforts to place several initiatives on the ballot for the general election in 2000. Two of those initiatives, Measures 92 and 98, "would have severely restricted, or prohibited, the ability of school districts and other employers to implement 'check-offs' for payroll deductions for union dues when some part of those dues were used for political purposes." *American Fed. Teachers*, 208 Or App at 353. Plaintiffs alleged, and the evidence permitted the jury to find, that the passage of those measures would have severely restricted plaintiffs' ability to collect union dues; that defendants placed the measures on the ballot with the intent to harm plaintiffs by, among other things, causing them to spend money to oppose passage of the measures; and that plaintiffs reasonably and necessarily spent money to oppose the measures.[3]

---

[1] The trial court, as part of its judgment in this case, entered a decree dissolving OTU-EF, and defendants did not challenge that part of the judgment on appeal.

[2] The relevant statutory definitions are quoted and discussed later in this opinion.

[3] The voters rejected the two measures.

In Count 1, plaintiffs alleged that defendants, through an employee, Kelli Highley, submitted to the Secretary of State forged signatures on statements of sponsorship for Measures 92 and 98, in violation of ORS 165.007(1)(a) (second-degree forgery) and ORS 165.013 (first-degree forgery). Based on those statements of sponsorship, plaintiffs alleged, the Secretary of State approved the measures for circulation, and defendants gathered sufficient signatures for them to be placed on the ballot. In Count 2, plaintiffs alleged that defendants, acting through I&R Petition Services, Klein Campaigns, and NFP, Inc., forged signatures on the initiative petitions and falsely certified petition signature sheets that they submitted to the Secretary of State, also in violation of ORS 165.007(1)(a) and ORS 165.013. In Count 3, plaintiffs alleged that defendants violated ORS 162.085(1) (unsworn falsification) by submitting false statements to the state in 1998, 1999, and 2000 on two different financial reporting documents to conceal the fact that OTU-EF (a tax-exempt, nonprofit corporation) had expended funds for OTU-PAC's political activities in support of Measures 92 and 98.

The jury, by special verdict, found the facts as alleged by plaintiffs, with one exception. The exception was the jury's finding, as to Count 2, that, although the enterprise with which defendants were associated had forged signatures on the initiative petitions and falsely had certified those petition sheets, those actions had not injured plaintiffs. The jury awarded damages on Counts 1 and 3, and, as noted, the court entered a judgment for plaintiffs and against both defendants in a total amount of approximately $2.5 million.[4]

After the jury returned its verdict, the state intervened in the action and joined plaintiffs in seeking injunctive relief against defendants. In ruling on the request for injunctive relief, the trial court made extensive findings of fact.

---

[4] On Count 1, the jury awarded damages of $65,112 to OEA and $40,500 to AFT. On Count 3, the jury awarded $671,658 to OEA and $170,000 to AFT. Because the damages awarded under Count 3 included the amounts that plaintiffs had claimed under Count 1, the trial court based the judgment only on the larger awards. The court trebled the damage awards pursuant to ORS 166.725(7)(a) and entered a judgment in favor of OEA and against OTU-PAC and OTU-EF, jointly and severally, for $2,014,974, and in favor of AFT and against OTU-PAC and OTU-EF, jointly and severally, for $510,000.

Those findings mirrored the jury's findings in most matters, but in some areas the court found further facts against defendants. The court then dissolved OTU-EF and entered a detailed injunction imposing restrictions on OTU-PAC and any successor organizations.

Defendants appealed and argued, as relevant to the issues before this court, that the trial court erred when it (1) denied defendants' motion to dismiss all three claims "for lack of any cognizable ORICO 'causation' for [plaintiffs'] asserted 'injury' and 'damages' as a matter of law"; (2) denied defendants' motion to dismiss Count 3 on the basis that the forms that OTU-EF and OTU-PAC submitted to the state did not constitute "application[s] for [a] benefit" under ORS 162.085(1) and, therefore, defendants had not violated that statute; and (3) denied defendants' motion for a directed verdict on Count 3 because plaintiffs had "supplied no evidence that, had OTU-PAC and OTU-EF filed accurate [reports with the state], OTU-EF would necessarily have lost its lawful status as a charitable corporation * * *."

A divided panel of the Court of Appeals affirmed the trial court's rulings,[5] with the exception of the trial court's denial of defendants' motion to dismiss Count 3 against OTU-PAC. That count alleged, in part, that plaintiffs had been harmed by defendant OTU-PAC's submission of false campaign contribution and expenditure reports (C&Es) to the state. The Court of Appeals concluded that C&Es are not an "application" for a "benefit" and, therefore, that falsification of the C&Es did not violate ORS 162.085(1). *American Fed. Teachers*, 208 Or App at 362-64. That holding did not change the amount of the damages awarded to plaintiffs on Count 3, but it required the Court of Appeals to modify the money judgment as to that count so that it applied only to OTU-EF and not to OTU-PAC. *Id.* at 365 n 16.[6]

---

[5] Judge Edmonds concurred in part and dissented in part. He would have reversed plaintiffs' judgment for money damages on the grounds that plaintiffs' damages "were not directly caused by defendants' wrongdoing." *American Fed. Teachers*, 208 Or App at 380 (Edmonds, J., concurring in part, dissenting in part). He also would have held that some aspects of the injunctive relief ordered by the trial court went beyond that authorized by law. *Id.* at 397-405.

[6] Plaintiffs moved for reconsideration of that aspect of the Court of Appeals decision. They did not challenge the court's conclusion that OTU-PAC's submission of false C&Es did not violate ORS 162.085(1), but argued instead that, because

## II.  DISCUSSION

A.  *The Oregon Racketeer Influenced and Corrupt Organization Act*

A brief review of the structure of ORICO provides context for the legal issues on review. As relevant here, ORICO provides, in part:

> "It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity * * *."

ORS 166.720(3). ORICO also defines the key statutory terms. "Enterprise" includes, among other things, "any individual, * * * corporation, * * * or other profit or nonprofit legal entity[.]" ORS 166.715(2). "Racketeering activity" is "conduct that constitutes a crime" under any one of the specific criminal statutes that are listed in ORS166.715(6)(a)—statutes that range from criminal homicide to bribery to certain financial crimes.[7] To establish an ORICO violation, the plaintiff must prove a "pattern of racketeering activity," which is defined, in part, as:

> "engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents * * * and that the last of such incidents occurred within five years after a prior incident of racketeering activity."

---

OTU-PAC acted in concert with OTU-EF, OTU-PAC should be jointly and severally liable with OTU-EF for the money judgment with respect to the latter's submission of false CT-12 forms (Count 3). The Court of Appeals rejected that theory of liability, holding that it had not been raised with sufficient specificity until the filing of plaintiffs' motion for reconsideration. *American Fed. Teachers*, 209 Or App at 521. Plaintiffs petitioned this court for review of that aspect of the Court of Appeals decision, and we held the petition pending our decision in this case. By order dated this date, we are denying plaintiffs' petition.

[7] Significantly, ORICO focuses on whether the defendant engaged in "conduct" that violates a listed criminal statute and does not require that the defendant have been charged with or convicted of the crime. *See Computer Concepts, Inc. v. Brandt*, 310 Or 706, 717, 801 P2d 800 (1990) (ORICO plaintiff must prove that defendant "engaged in all of the elements of a listed crime," but not that defendant was convicted of any crime).

ORS 166.715(4). Finally, as we discuss in greater detail below, any person injured by an ORICO violation can recover three times the actual damages that the person has sustained by reason of that violation:

> "Any person who is injured *by reason of* any violation of the provisions of ORS 166.720(1) to (4) shall have a cause of action for three-fold the actual damages sustained and, when appropriate, punitive damages[.]"

ORS 166.725(7)(a) (emphasis added).

In this case, plaintiffs allege that defendants and their agents violated ORICO by engaging in a pattern of racketeering activity. The forgery of signatures alleged in Counts 1 and 2 would violate ORS 165.007(1) and ORS 167.013, which define forgery and related offenses, and therefore could permissibly be alleged to be racketeering activities under ORS 166.715(6)(a)(P). The submission of false statements by OTU-EF to the Attorney General on a form that charitable organizations are required to submit (the CT-12 form), as alleged in Count 3, would (as we hold below) violate ORS 162.085(1), which prohibits unsworn falsification in connection with an application for a government benefit, and therefore could permissibly be alleged to be a racketeering activity under ORS 166.715(6)(a)(B).

On review, defendants do not challenge the jury's findings that they did, in fact, forge sponsorship and petition signatures or that OTU-EF submitted false reports to the Attorney General regarding its charitable activities. Neither do they dispute that they participated in an "enterprise" or that their activities constituted a "pattern" because they were not "isolated," but rather consisted of at least two incidents involving "the same or similar intents." That is, defendants do not deny that, at least in the abstract, they committed the ORICO violations alleged in the complaint.

Defendants argue instead that plaintiffs cannot recover damages from them because, even if they did violate ORICO, plaintiffs were not "injured by reason of" defendants' acts. Defendants' central argument, stated briefly, is that the words "injured by reason of" in ORS 166.725(7)(a) require a "direct" causal connection between defendants' acts and the

damages claimed by plaintiffs, and that neither the allegations in the complaint nor the evidence at trial demonstrated the required relationship. Defendants also argue that their filing of false CT-12 forms, as alleged in Count 3, did not violate the underlying criminal law against unsworn falsification in connection with an application for government benefits, because the CT-12 form is not an "application for [a] benefit."

B.  *Submission of the CT-12 Forms by OTU-EF*

Because a conclusion favorable to defendants on the CT-12 form issue would make it unnecessary to consider the injury issue, at least with respect to Count 3, we address that question first. ORS 128.670 requires that charitable trusts and corporations, like OTU-EF, file periodic written reports with the Attorney General, including information prescribed by the Attorney General by rule, "as to the nature of the assets held for charitable purposes and the administration thereof by the corporation or trustee." The Attorney General created the CT-12 form to collect that information from charitable organizations.

Defendants contend that the annual submission of the CT-12 form, which must be accompanied by the organization's IRS form 990, is not an "application for [a] benefit" within the meaning of ORS 162.085. Defendants note that ORS 128.670 describes the information that the Attorney General may collect as a "report" and argue that the Attorney General does not have the authority to "reject" the submission of a CT-12 form. Defendants argue that a CT-12 form is similar to an income tax return, which, they assert, no one would suggest is an "application" for a "benefit." It follows, according to defendants, that their filing of CT-12 forms containing false statements cannot be a predicate criminal act for ORICO purposes.[8]

---

[8] The evidence was sufficient to permit a jury to find a number of false statements and omissions in OTU-EF's CT-12 forms. OTU-EF, for example, falsely stated each year that it was not involved in legislative activity. It also failed to disclose its substantial financial transfers to OTU-PAC. On a number of occasions, Sizemore wrote checks of $50,000 and $25,000 from OTU-EF directly to for-profit corporations hired to gather signatures for the measures at issue here. Those transfers were not properly disclosed. Plaintiffs introduced evidence that OTU-EF applied 60 percent of its total 1997-98 expenditures to political activities related to

ORS 162.085 provides:

"(1)   A person commits the crime of unsworn falsifica--
tion if the person knowingly makes any false written state-
ment to a public servant *in connection with an application
for any benefit.*

"(2)   Unsworn falsification is a Class B misdemeanor."

(Emphasis added.) "Benefit," for purposes of ORS 162.085, is
defined as "gain or advantage to the beneficiary or to a third
person pursuant to the desire or consent of the beneficiary."
ORS162.055(1). The statutes provide no definition of "appli-
cation," but, as the Court of Appeals noted, "application" com-
monly means an " 'appeal; request; [or a] petition * * *.' "
*American Fed. Teachers,* 208 Or App at 361 (quoting
*Webster's Third New Int'l Dictionary* 105 (unabridged ed
2002)). The Court of Appeals also pointed out that nothing in
the wording or structure of ORS 162.085 restricts an "appli-
cation" to a single, original application and that the term
encompasses a written submission requesting a renewal of a
benefit. *Id.* at 363-64. Moreover, the statute prohibits not
only false statements in the application itself, but also false
statements "in connection with" an application.

We note initially that defendants' income tax
analogy is inapposite. Although persons meeting certain
requirements must file income tax returns—and are subject
to penalties if they do not—the filing of an income tax return
confers no specific "benefit" on the filer that is not available to
other persons. The filing of a CT-12 form, in contrast, is a
requirement for a corporation that wants to engage in
fundraising by holding itself out as a tax-exempt organiza-
tion and soliciting contributions that are, in most circum-
stances, tax-deductible for the donor and protected from
public disclosure. Those fundraising, tax-exemption, and con-
fidentiality benefits are conditioned, among other things, on
the filing of accurate and timely CT-12 forms. A charitable
organization that fails to file the CT-12 form when due is sub-
ject to civil penalties, and the Attorney General may order

---

OTU-PAC, rather than to the kind of educational, research, or other charitable
activities for which it allegedly had been created. That figure was 43 percent in
1998-99 and 72 percent in 1999-2000. Sizemore signed the OTU-EF forms as exec-
utive director of that organization.

the organization to cease soliciting charitable contributions until the report is filed. ORS 128.670(8)(a), (b). *See* OAR 137-010-0005 to 137-010-0044 (establishing reporting requirements for charitable organizations and penalties for noncompliance). Moreover, the Attorney General can, pursuant to ORS 128.866, "obtain an injunction against solicitation of contributions" by a charitable organization that does not comply "with all registration and reporting requirements of the Charitable Solicitations Act and ORS 128.610 to 128.750" or that has breached any of its fiduciary duties. Finally, the Attorney General is authorized to seek a court order dissolving a corporation that has abused its legal authority or "fraudulently solicited money" or "fraudulently used the money solicited[,]" ORS 65.661(1)(a)(C)—as the Attorney General ultimately did in this case.

We conclude that the information contained in a CT-12 form is a "written statement" submitted "in connection with" the request, or application, for the "benefit" of being permitted to solicit tax-exempt donations. That permission plainly is a "gain or advantage to the beneficiary or to a third person[,]" and therefore is a "benefit" for purposes of ORS 162.085. The Court of Appeals correctly held that "OTU-EF's submissions of the false CT-12s were material to its continuing eligibility and beneficial entitlement to engage in fundraising activities in Oregon." *American Fed. Teachers*, 208 Or App at 365. Consequently, when the jury found that defendant OTU-EF filed false CT-12 forms as part of its enterprise with OTU-PAC and others, it also was permitted to find that OTU-EF had committed the crime of unsworn falsification, ORS 162.085, which is a predicate offense under ORICO.

C. *Plaintiffs' Recovery of Damages Caused by Defendants' Conduct*

We turn to the primary issue on review: whether plaintiffs can recover the expenses that they incurred in opposing Measures 92 and 98 as damages from defendants. We again quote ORS 166.725(7)(a), which provides for a private right of action for damages for a person "injured by reason of" an ORICO violation:

"Any person who is *injured by reason of* any violation of the provisions of ORS 166.720(1) to (4) shall have a cause of

> action for three-fold the actual damages sustained and, when appropriate, punitive damages[.]"

(Emphasis added.) The emphasized words in the statute highlight two aspects of any award of damages in a private ORICO action: first, the nature of the "injur[y]" claimed by the plaintiff, and, second, "causation"—whether the plaintiff suffered those injuries "by reason of" the defendant's ORICO violation. On review, the parties focus on causation. However, we briefly discuss the reasons that we do not address the first issue—the kind of "injury" that may provide the basis for a private action for damages under ORICO.

Plaintiffs introduced evidence that permitted the jury to find that defendants placed Measures 92 and 98 on the ballot with the intent to injure plaintiffs by, among other things, causing them to spend money to oppose those measures. Plaintiffs did spend money to oppose the placement of the measures on the ballot and, after the measures were placed on the ballot, they spent money to defeat the measures in the 2000 general election. Plaintiffs introduced evidence that, given the threat that the measures presented to them as public employee labor organizations, they had no realistic option other than to spend money to oppose the measures. Plaintiffs detailed the expenditures that they made, and the jury awarded damages based on those expenditures.

For their part, defendants did not argue at trial or on appeal that plaintiffs' expenditures were unreasonable in amount or unnecessary in terms of plaintiffs' efforts to protect their institutional interests, and we therefore have no reason to decide whether those considerations are relevant in determining the kinds or amount of damages that may be recovered under ORICO. In the Court of Appeals, defendants asserted that plaintiffs' expenditures were "voluntary," because nothing required plaintiffs to spend money opposing the measures, and "indirect," because plaintiffs did not themselves advertise in opposition to the measures, but instead contributed money to political committees that opposed the measures. Defendants argued that such voluntary and indirect expenditures could not, as a matter of law, constitute "injury" or damages for ORICO purposes. That argument

was unsuccessful in the Court of Appeals, however, and defendants did not raise it on review.

In their petition for review, defendants did argue that "the legislature did not intend for opponents of ballot measures to be able to use ORICO to recover their campaign expenditures." They acknowledged, however, that that argument "was not raised directly in the Court of Appeals," but rather was suggested to them by the dissent in the Court of Appeals. To the extent that defendants even raised that issue in the trial court, they lost, and, as noted, they failed to make that argument to the Court of Appeals. We conclude that that argument is not preserved and decline to consider it. *See State v. King*, 307 Or 332, 338, 768 P2d 391 (1989) (refusing to consider argument made in trial court, but not made in Court of Appeals); ORAP 9.20(2) (if Supreme Court allows review and does not limit questions on review, questions before Supreme Court include all questions properly before the Court of Appeals that petitioner or respondent claims were erroneously decided by that court). Consequently, we have no occasion to consider whether an ORICO defendant may, in an appropriate case, be able to assert that ORS 166.725(7)(a) does not permit a private plaintiff to recover for expenditures that the defendant can show were unnecessary or unreasonable, "voluntary," or related to a political campaign.

We turn to the issue of causation. Defendants articulate their basic theme as follows:

> "[T]he pattern of racketeering activity must be the *proximate* or *direct* cause of the plaintiff's injury, not just a remote or speculative cause. It must be the *reason* the plaintiff suffered financial loss, not merely one incident in a sequence of events that preceded the loss."

(Emphases in original.) Defendants thus argue that plaintiffs must allege and prove that defendants' conduct not only was a factual cause of plaintiffs' injury, but also was the "proximate" or "direct" cause of that injury. "Factual causation" exists when a defendant's conduct "was a substantial factor in producing [the] plaintiff's injury." *Simpson v. Sisters of Charity of Providence*, 284 Or 547, 555, 588 P2d 4 (1978). As

to factual causation, there is little dispute between the parties as to the proper legal standard (although, as discussed below, defendants argue that the evidence does not establish factual causation).

The parties disagree, however, as to what an ORICO plaintiff must show, in addition to factual causation, to recover damages from an ORICO defendant. In particular, defendants argue that we should interpret the words "injured by reason of" in ORS 166.725(7)(a) to require "proximate" or "direct" cause, in the same way that the United States Supreme Court interpreted the words "injured * * * by reason of" in the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 USC § 1964(c), in *Holmes v. Sec. Investor Prot. Corp.*, 503 US 258, 265-71, 112 S Ct 1311, 117 L Ed 2d 532 (1992).[9] We briefly discuss the Court's decision in *Holmes* and then return to the facts of this case.

In *Holmes*, the plaintiff, the Securities Investor Protection Corporation (SIPC), a federally chartered organization created to reimburse customers of member securities brokers who become insolvent, sought to recover damages pursuant to RICO from various defendants who allegedly had engaged in a stock-manipulation scheme. 503 US at 261. SIPC's causation theory was that the defendants, in violation of the federal securities laws, had manipulated the stock prices of several companies. After the defendants' scheme was discovered, the price of the stocks declined sharply, and the broker-dealers that held the stocks became insolvent. As a result, the broker-dealers were unable to pay other claims that their *customers* had against them—claims entirely unrelated to the defendants' stock manipulation. Consequently, SIPC was required to advance funds to cover those claims. *Id.* at 262-63.

The Supreme Court held that, in those circumstances, the relationship between the defendants' unlawful

---

[9] Defendants argue that this court should follow the Supreme Court's decision in *Holmes* because the interpretation of the federal RICO statute sheds light on what the Oregon legislature intended when it enacted ORICO. Although we reject that argument for the obvious reason that *Holmes* was decided 10 years *after* the legislature enacted ORS 166.725(7)(a), we nevertheless find *Holmes* to be a helpful discussion of causation.

conduct and the injury for which SIPC sought damages was too attenuated to permit recovery:

> "[T]he link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims."

503 US at 271. The Court held that, for a private plaintiff to recover damages under RICO, the plaintiff must show that the defendant's violation was not only a "but for" cause of the plaintiff's injury, but also was the "proximate cause" of that injury. *Id.* at 268. The court stated that a "direct" relationship between the defendant's conduct and the plaintiff's injury could be the basis for liability, *id.* at 269, but one that was "too remote" or "indirect" could not be. *Id.* at 268, 274.

Defendants urge us to adopt the Supreme Court's reasoning in *Holmes* and to hold that an ORICO plaintiff can recover only for injuries that are "directly" or "proximately" caused by defendants' actions. Plaintiffs respond that *Holmes* does not accurately state the test for determining whether a plaintiff is "injured by reason of" an ORICO violation, because Oregon long ago abandoned the concept of proximate cause in tort law and there is no reason to resurrect that test in interpreting ORS 166.725(7)(a). Plaintiffs argue that, even under the *Holmes* test, however, their injuries are recoverable, because those injuries were the direct and intended result of defendants' ORICO violations.

We need not decide whether *Holmes* provides the correct standard for determining causation for ORICO purposes. We agree with plaintiffs that, even under the *Holmes* test urged by defendants, plaintiffs were "injured by reason of" defendants' actions, within the meaning of ORS 166.725(7)(a).[10] An ORICO violation, like many acts by individuals or groups, may create ripples that spread far beyond the immediate sphere of the actor. Defendants may well be

---

[10] We refer to the *Holmes* test only as a potentially helpful analytical construct for our interpretation of ORS 166.725(7)(a). This case turns entirely on issues of Oregon law.

correct that some ripple effects are so remote and attenuated that the legislature did not intend a person injured by them to be able to recover damages. However, this case does not require us to consider exactly how far liability for those effects extends under ORS 166.725(7)(a). The statute permits recovery for those "injured by reason of" a violation, and, whether that statute is interpreted to require a showing of "direct" and "proximate" injury, as defendants assert based on *Holmes*, or some lesser standard, it unquestionably permits recovery for injuries that are the *intended* consequence of an ORICO violation.[11] That is, a plaintiff that can prove that its injuries were the intended consequence of a defendant's ORICO violation may recover for those injuries under ORS 166.725(7)(a).

We therefore turn to defendants' arguments that plaintiffs failed to allege and prove that they were "injured by reason of" defendants' ORICO violations because there was not a sufficient causal link between defendants' actions and plaintiffs' injuries. Defendants argue that the judgment must be reversed because Counts 1 and 3 do not allege facts showing that plaintiffs had been "injured by reason of" defendants' acts. Defendants also argue that no evidence supported plaintiffs' claim in Count 3. We examine defendants' arguments as to each count to determine whether the allegations (as to Counts 1 and 3) and the evidence (as to Count 3) demonstrate that plaintiffs were "injured by reason of" defendants' ORICO violations.[12]

---

[11] That reading of *Holmes* is supported by the Supreme Court's recent decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 US ____, 128 S Ct 2131, 170 L Ed 2d 1012 (2008). There, the Court held that mail fraud by RICO defendants, which was part of a scheme intended to harm the plaintiffs (competitors of the defendants), could be a predicate racketeering act for the purposes of a private RICO action, even though the fraudulent statements were made to, and relied upon, by third parties and not by the plaintiffs. The Court emphasized that, although the plaintiffs had not received or relied upon the misrepresentations, they were "the primary and intended victims of the scheme to defraud." 553 US at ____, 128 S Ct at 2139. It also relied upon the general tort principle that one " 'who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances.' " *Id.* at ____, 128 S Ct at 2143 (quoting *Restatement (Second) of Torts* § 870). Plaintiffs here are in the same position as the plaintiffs in *Bridge* in that they were the intended victims of defendants' wrongful conduct, although the forged signatures and the fraudulent documents were submitted to third parties.

[12] Defendants' argument that plaintiffs failed to state a claim for relief challenges the sufficiency of the *allegations* of Counts 1 and 3 and the sufficiency of the

### 1. *Count 1*

■■      In reviewing a trial court ruling on a motion to dismiss for failure to state a claim for relief, ORCP 21 A(8), we accept as true all of the allegations and give the nonmoving party the benefit of all favorable inferences that can be drawn from those allegations. *See Bailey v. Lewis Farm, Inc.*, 343 Or 276, 278, 171 P3d 336 (2007) (stating standard of review).

The process for placing an initiative measure on the ballot begins with the submission to the Secretary of State of a prospective petition with a "statement of sponsorship" signed by 25 electors. *Former* ORS 250.045(1).[13] In Count 1, plaintiffs alleged that defendants knowingly and intentionally, and with the intent to injure plaintiffs, forged signatures and made false statements in connection with the statements of sponsorship for Measures 92 and 98. Plaintiffs further alleged that, as a result of those forgeries, the Secretary of State approved the initiative petitions for circulation, which led to the placement of Measures 92 and 98 on the ballot. Finally, plaintiffs alleged that they made expenditures to oppose certification of the ballot titles for those measures and to oppose the measures themselves, once they qualified to be placed on the ballot; that those expenditures "were reasonable and necessary" because the measures, if passed, would have had a severe effect on plaintiffs' ability to collect union dues; and that the expenditures "were the expected consequence of [defendants'] enterprise."

Defendants argue first that those allegations are insufficient to allege factual causation because, even if defendants had forged some of the signatures, defendants easily could have obtained the required 25 genuine signatures. Defendants note that the complaints admit that defendants

---

*evidence* with respect to Count 3. Because the case was tried, the complaints are deemed to have been amended to conform to the evidence that was introduced without objection. *See* ORCP 23 B (so providing). Accordingly, the only proper inquiry on defendants' motion is whether evidence in the record supports the jury verdict. However, because the evidence at trial generally was consistent with the allegations, for convenience we will refer to the allegations as well as to the evidence.

[13] In 2007, the legislature increased to 1,000 the number of sponsorship signatures required for a prospective petition. *See* ORS 250.045(1) (2007). In this opinion, we refer to the version of the statute in effect at the times relevant to the conduct alleged in the complaints.

obtained sufficient signatures (approximately 89,000) to place the measures on the ballot, which indicates that defendants would have been able to find 25 sponsors for the measures. Additionally, defendants argue that the allegations fail the factual causation test because plaintiffs could not "prove that 25 *genuine* signatures could not have been obtained before a deadline for filing the statement of sponsorship." (Emphasis in original.)

Defendants' argument fails for two reasons. First, on a motion to dismiss, where we consider only the allegations in the complaint, plaintiffs do not have to "prove" anything. Plaintiffs alleged that defendants falsified signatures on the statements of sponsorship and that, based upon those statements, the Secretary of State began the process that led to the placement of the measures on the ballot. No one disputes that submission of a proposed initiative petition, with the signatures of 25 electors, was a necessary step to place a state measure on the ballot. Defendants' submission of the proposed petitions and signatures to the Secretary of State was a "substantial factor" in the ultimate placement of the measures on the ballot because, had the proposed petitions not been submitted, the Secretary of State would not have approved the petitions for signature collection, sufficient signatures would not have been gathered, and the measures would not have appeared on the ballot. In other words, the proposed petitions and statements of sponsorship were a necessary link in the chain of events that caused the harm that plaintiffs alleged.

Second, defendants err in relying on cases like *Joshi v. Providence Health System*, 342 Or 152, 149 P3d 1164 (2006), where this court held that a plaintiff in a wrongful death case alleging medical negligence could not establish factual causation by showing that the defendant's negligence, at most, deprived the decedent of a 30 percent chance of surviving a stroke. That increase, this court stated, was insufficient to demonstrate, to a reasonable degree of *probability*, that the defendant's negligence "caused" the decedent's death. *Id.* at 164. Here, in contrast, defendants' submission of forged signatures *did* result in, *i.e.*, "cause," the Secretary of State's approval of the initiative petitions for signature gathering, as a matter of historical fact. Defendants

can hardly rewind the tape and argue that, had they filed genuine rather than forged signatures, plaintiffs likely would have suffered the same injuries, when, unlike in *Joshi*, the allegation (and the evidence) was that defendants' actions were in fact a necessary link in the causal chain. Plaintiffs properly alleged that defendants' submission of the prospective petitions with forged statements of sponsorship resulted in the circulation of Measures 92 and 98 for signatures and the subsequent placement of those measures on the November 2000 ballot.

Defendants also argue that plaintiffs' injuries were not factually "caused" by defendants' racketeering activities because there was a long chain of events, with several intervening causal factors, between the forgeries on the statements of sponsorship and the certification of the measures for the general election ballot. Defendants identify as one intervening cause the certification of the sponsorship signatures by the county clerks from the counties where the sponsorship signatures were obtained. As another intervening cause, they point to the Secretary of State's certification of the initiative petition for inclusion on the ballot for the 2000 general election, after he determined that defendants had submitted the required number of signatures. Defendants contend that those acts, rather than the forged sponsorship signatures, were "the reason—the 'cause'—that any proposed initiative would be approved" for placement on the ballot.

■ Defendants' position cannot be squared with this court's cases. The question with respect to factual causation, as noted, is whether defendants' conduct was a substantial factor in causing plaintiffs' injuries. As this court has suggested in a slightly different context, the "subsequent negligent conduct of * * * a third party cannot insulate a prior negligent actor from liability when the conduct of both was a substantial factor in producing harm." *Rice v. Hyster Co.*, 273 Or 191, 205, 540 P2d 989 (1975).[14] As we described above, the submission of sponsorship statements was a necessary step in the process of seeking to place the measures on the ballot. The fact that other, later, steps also were a part of that process does not mean that defendants' use of forged signatures

---

[14] Here, of course, the prior acts were *intentional*, rather than negligent.

on the sponsorship statements was not a "substantial factor" in causing the damages that plaintiffs suffered as a result of defendants' actions.

Even if plaintiffs properly alleged factual causation, defendants argue, Count 1 nevertheless fails to state a claim because the allegations do not demonstrate that defendants' conduct was a "direct" cause of plaintiffs' injuries, as required by ORICO. Defendants are incorrect. Plaintiffs alleged that the very purpose of the enterprise and the actions that it took, including the forged sponsorship signatures, was to harm plaintiffs by, among other things, forcing plaintiffs to spend their money and time opposing the measures. We agree with the Court of Appeals' description of the connection between defendants' acts and the harm:

> "Causation on the facts pleaded here was not 'labyrinthine.' It was simple and direct. Defendants' alleged predicate acts were directed at putting several initiatives on the ballot to achieve either or both of two purposes: (1) to severely restrict or prohibit plaintiffs' abilities to collect union dues to the extent that some portion of those dues were used for political purposes—and, thus, ultimately to cripple plaintiffs' participation in the political process; and (2) to force plaintiffs to expend substantial funds to defeat the measures and, in doing so, to divert those resources from other efforts. Thus, unlike in *Holmes*, in which the chain of causation was reminiscent of the game of 'Mousetrap,' causation, as alleged here, was basic and blunt. Defendants intended to cause precisely this sort of injury to plaintiffs. The only contingency in producing that injury was the success of defendants' efforts."

*American Fed. Teachers*, 208 Or App at 369 (footnote omitted). That is, plaintiffs were the very targets of defendants' illegal conduct, and the injuries that plaintiffs suffered were the very injuries that defendants intended to cause. *Accord, Bridge v. Phoenix Bond & Indemnity Co.*, 553 US ___ , 128 S Ct 2131, 170 L Ed 2d 1012 (2008) (RICO action could be based on mail fraud engaged in with purpose and intent to harm plaintiffs even when fraudulent statements not made to or relied upon by plaintiffs). In Count 1, plaintiffs alleged that defendants' forgeries of the sponsorship statements were intended to injure plaintiffs by leading to the placement

of the measures on the ballot and thus to the expenditure of funds by plaintiffs. Those allegations sufficiently linked defendants' actions with plaintiffs' injuries to state a claim for relief under ORS 166.725(7)(a). The trial court did not err in denying defendants' motion to dismiss Count 1.

### 2.  *Count 3 - Challenge to the Allegations*

As outlined above, plaintiffs alleged that OTU-EF submitted false statements to the Attorney General on the CT-12 forms. Plaintiffs alleged that those false CT-12 forms "conceal[ed] the actual use of funds raised by OTU-EF to support OTU-PAC activity related to Measures 92 and 98, * * * enabling more funds to be raised to support Measures 92 and 98 through the tax exempt OTU-EF." The filing of the forms containing knowingly false statements, the complaint alleged, constituted unsworn falsification under ORS 162.085 (a racketeering activity under ORICO, ORS 166.715(6)(B)), and enabled defendants to "raise the necessary funds to collect signatures to qualify Measures 92 and 98 for the 2000 general election ballot." As a result of those acts, plaintiffs "expended funds, as defendants knew and intended they would, by contributing to campaigns to oppose Measures 92 and 98." But for defendants' acts, plaintiffs alleged, the measures would not have qualified for the ballot, and plaintiffs would not have had to expend funds to oppose them.

Defendants' sole argument that Count 3 failed to allege factual causation is that "plaintiffs had to show that had OTU-EF's filings been truthful, OTU-PAC—or the other political committees supporting those measure[s]—would not have been able to raise sufficient funds to place Measures 92 and 98 on the ballot." Defendants assert that plaintiffs offered no such evidence. Defendants' argument fails for the same reasons that we rejected defendants' argument that Count 1 failed to state a claim for relief: defendants' motion is directed to the pleadings, not to the evidence, and the pleadings sufficiently allege that defendants' acts were a substantial factor in causing plaintiffs' injury.

Defendants' second argument regarding Count 3 also mirrors their second argument with respect to Count 1: that the complaints fail to state a claim for relief because they

do not allege that plaintiffs' injuries were a "direct" result of the false statements on the CT-12 forms. We disagree. The complaints allege that one of the purposes of defendants' filing of false CT-12 forms was to raise funds to place Measures 92 and 98 on the ballot and thereby to harm plaintiffs. OTU-EF raised funds that contributors treated as tax-deductible charitable contributions and that were not subject to public disclosure. It then used those funds improperly for the political purpose of promoting OTU-PAC's ballot measures and for the wages of OTU-EF employees who, rather than working on educational or other charitable matters, spent much of their time advancing OTU-PAC's political agenda. Count 3 alleged that the knowingly false statements concerning OTU-EF's activities and expenditures concealed its support for the ballot measures and its integral role in the enterprise with OTU-PAC, Sizemore, and others that was intended to, and did, cause plaintiffs' injuries. The complaints alleged that defendants had specifically targeted plaintiffs for harm and that the false CT-12 forms helped cause that harm by permitting the supposedly educational charitable organization to raise funds and secretly use those funds to promote the ballot measures that were intended to harm plaintiffs. Again, even using the "direct" harm test of *Holmes*, as defendants suggest, plaintiffs' complaints are sufficient.

### 3.   *Count 3 - Challenge to the Sufficiency of the Evidence*

██  Defendants' other major argument on review challenges the sufficiency of the evidence to support the jury verdict with respect to Count 3. Defendants contend that plaintiffs failed to produce evidence to support the allegation that plaintiffs had been "injured by reason of" OTU-EF's submission of false CT-12 forms to the state. Defendants argue that the Court of Appeals erred in affirming the trial court's denial of defendants' motion for a directed verdict as to Count 3.

> "This court reviews the denial of a motion for directed verdict for any evidence to support the verdict in plaintiff's favor * * * [and we] cannot set aside a jury's verdict unless there was no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action."

*Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003). Because the jury found for plaintiffs, we construe all reasonable inferences from the evidence in favor of plaintiffs. *Id.*

The evidence, viewed in the light most favorable to plaintiffs, was sufficient to permit a reasonable jury to conclude that plaintiffs had been "injured by reason of" OTU-EF's submission of false CT-12 forms. That evidence included testimony by Sizemore, a director of both OTU-PAC and OTU-EF, that he had created OTU-EF in 1993 because he was having trouble raising money through OTU-PAC because of the need to file C&Es disclosing the names of contributors with the Secretary of State. The jury heard other testimony that OTU-EF had been established as a fund raising channel because contributors to OTU-PAC were hesitant to make contributions if their identities and the amounts of their contributions would be disclosed, as is the case for contributions to political committees,[15] but that they were willing to make contributions to a charitable organization such as OTU-EF because their identities could remain hidden and because the contributions would be tax deductible. Plaintiffs introduced evidence that the submission of false CT-12 forms began at least as early as 1998. Plaintiffs' expert testified that, had OTU-EF submitted factually accurate CT-12 forms, the Attorney General "almost certainly would have followed up on that" and would have had various options to stop OTU-EF from providing funding to OTU-PAC for political activities. The expert testified that, in his view, had the CT-12 forms truthfully disclosed OTU-EF's activities, the Attorney General at least would have sought a cease and desist order. He stated that, in his experience, nonprofit entities had received follow-up inquiries from the Attorney General, based on the contents of their CT-12 forms. Other evidence demonstrated that OTU-EF provided over $120,000 to OTU-PAC for political activities, some of which was paid directly to the companies, controlled by Sizemore, that were responsible

---

[15] Sizemore testified that OTU-PAC was "having a challenge with donors being afraid to donate because of union harassment and boycotts of their companies * * *."

for more than 80 percent of the signatures gathered to qualify the measures for the ballot. Finally, there was evidence that employees on the OTU-EF payroll actually spent substantial amounts of their time on OTU-PAC business, including working to qualify Measures 92 and 98 for the ballot.

Defendants argue that that evidence was insufficient to prove factual causation because it failed to establish the following chain of events: that "but for" the filing of the false CT-12 forms, OTU-EF would have lost its status as a charitable corporation before the 2000 election cycle; that, as a result of losing that status, OTU-EF would have seen a decline in contributions; and that, as a result of OTU-EF's problems, OTU-PAC would not have had sufficient funds to gather the signatures to put the measures on the ballot. Defendants point to the statement by plaintiffs' expert witness on nonprofit corporations that, although the Attorney General would have had a number of options available to him had OTU-EF filed accurate CT-12 forms that revealed its improper use of charitable contributions for political activity, he could not state with certainty what action the Attorney General would have taken. Defendants also note that the expert witness stated that any investigation into improper conduct by a charitable corporation would take months and that he was unaware of any instance in which the Attorney General had revoked a charitable corporation's permission to solicit tax-deductible contributions.

Defendants' arguments miss the point. Plaintiffs were not required to prove that OTU-EF *necessarily would have lost* its status as a charitable organization authorized to engage in fundraising if it had filed truthful CT-12 forms. The issue is whether, viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could have found that, had OTU-EF filed truthful CT-12 forms, the Attorney General likely would have taken steps to halt its unlawful activity and support for the measures, and plaintiffs' injuries would not have occurred. As to the Attorney General's actions, the unrebutted testimony of plaintiffs' expert provided a basis for the jury to conclude that the Attorney General likely would have taken steps to stop OTU-EF's activities. Indeed, as the Court of Appeals noted, *American Fed. Teachers*, 208 Or App at 374 n 23, the Attorney

General's actual intervention in this case in order to seek the dissolution of OTU-EF, supports the inferences that the jury could have drawn from the expert's testimony with respect to the Attorney General's possible actions. As to the impact of the loss of funds from OTU-EF on defendants' ballot measure effort, Sizemore and others testified about the difficulties OTU-PAC had raising money, the desire of some major contributors to avoid public disclosure of their contributions, and the tens of thousands of dollars transferred from OTU-EF to OTU-PAC. Testimony from Sizemore and Miller permitted the jury to find that OTU-EF's ability to solicit tax-deductible contributions and funnel them to OTU-PAC to support the effort to place Measures 92 and 98 on the ballot was critical to the success of that effort. We conclude that there was evidence to support plaintiffs' claim that OTU-EF's filing of materially false CT-12 forms was a substantial factor in causing plaintiffs' injuries.

Defendants also argue that the evidence does not support the jury verdict that plaintiffs were injured "by reason of" OTU-EF's activities (including transferring substantial funds to OTU-PAC for political purposes, use of OTU-EF employees for OTU-PAC work, and submitting false CT-12 forms to conceal those activities) because there was no evidence that that conduct was a "direct" or "proximate" cause of plaintiffs' injuries. As discussed above, there was evidence from which the jury could find that the false CT-12 forms were part of a scheme in which the same individuals, with the same intent—causing plaintiffs to spend substantial amounts of money to oppose anti-union ballot measures—financed their scheme by soliciting supposedly charitable contributions and then using the contributions for political purposes, while avoiding detection by filing knowingly false documents. As one of the participants, Miller, testified, placing the measures on the ballot was important because it allowed defendants "to do two things at once, stop an agenda that we disagreed with [by forcing plaintiffs to spend money in opposition to the measures] and advance one that we agreed with." There was evidence from which the jury could find that the false CT-12 forms were an essential part of defendants' plan to harm plaintiffs in precisely that manner.

## III.  CONCLUSION

To summarize, we conclude that plaintiffs were "injured by reason of" defendants' ORICO violations, ORS 166.725(7)(a), because plaintiffs alleged and proved that defendants intended to and did harm plaintiffs by actions that defendants took as part of a pattern of racketeering activity. The Court of Appeals correctly affirmed the trial court order denying defendants' motion to dismiss Count 1, because that count properly alleged that plaintiffs were injured by reason of the false statements of sponsorship submitted by defendants in connection with Measures 92 and 98. The Court of Appeals also was correct in affirming the denial of OTU-EF's motion to dismiss Count 3 and the denial of OTU-EF's motion for a directed verdict on that count: the CT-12 form is a document filed in connection with an application for a benefit; the complaint properly alleged that plaintiffs had been "injured by reason of" OTU-EF's racketeering activities, including filing false CT-12 forms; and the evidence supported the jury finding that plaintiffs had been "injured by reason of" OTU-EF's racketeering activities.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.